# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JORDAN CONRAD JOHNSON,

Defendant-Appellant.

FOR PUBLICATION
April 19, 2016
9:20 a.m.

No. 325857
Berrien Circuit Court
LC No. 2014-003481-FC

Before: O'CONNELL, P.J., and MARKEY and MURRAY, JJ.

MURRAY, J.

Defendant appeals as of right his jury trial convictions of four counts of first-degree criminal sexual conduct, MCL 750.520b(1)(a), and one count of second-degree criminal sexual conduct, MCL 750.520c(1)(a). Defendant was sentenced to 25 to 90 years' imprisonment for each of his first-degree criminal sexual conduct convictions and 71 months to 15 years' imprisonment for his second-degree criminal sexual conduct conviction. We affirm defendant's convictions and sentences, but vacate the order imposing a $100 fine and vacate $900 of the $2,564 restitution order, and remand for the trial court to modify the judgment of sentence accordingly.

## I. INTRODUCTION

This case involves a number of challenges to the relatively new courtroom procedure of allowing a witness to be accompanied on the witness stand by a support animal—an animal that provides comfort to a witness while the witness testifies. While no Michigan court has addressed whether a witness may be accompanied by a support animal, other jurisdictions have upheld this procedure as part of a trial court's inherent authority to control the courtroom. For the reasons expressed below, so do we.

## II. FACTUAL BACKGROUND

This appeal arises out of defendant's sexual contact with his six-year-old niece. According to the evidence supporting the jury's verdict, from 2011 to 2014, defendant occasionally provided babysitting services for his brother and sister-in-law when other family members were unavailable to babysit their two children. While babysitting, defendant would take the victim into the bathroom or another room and sexually abuse her. One time, when the

-1-

victim's 10-year-old brother tried to investigate what was happening when defendant and the victim went into a different room, he was told to "go away."

The victim eventually revealed the sexual abuse to her parents in June or July of 2014. The victim's parents were planning on going out, but when the victim heard that defendant would be babysitting, she "became hysterical" and "broke down," crying and screaming. The victim told her parents that she did not want defendant to babysit because defendant put "his penis in her butt." Over the next couple weeks, the victim provided her parents with more details about the sexual encounters with defendant. The victim's mother subsequently took the victim to the family doctor, who did not find any injuries to the victim's butt or vagina, but did make the necessary report to Child Protective Services (CPS).

As a result, CPS called the victim's mother and requested that she take the victim to the hospital to get a full medical examination. At the hospital, Angie Mann, a sexual assault nurse examiner, performed an examination of the victim. During the examination, the victim initially did not want to talk about the sexual abuse, but she eventually described that defendant would put his fingers in her butt and his penis in her mouth. According to Mann, the victim's "exact words were" that defendant put "his penis in her mouth and he didn't even wash it first." Mann saw a "very thin, pale, vertical line" in the victim's anus, which is consistent with penile penetration and sexual assault.

Defendant denied any sexual contact with the victim. Instead, defendant testified that he would take the victim into another room to discipline her, because if he did not, the victim's brother would watch and laugh. The jury apparently did not believe defendant's version of events, as he was convicted as mentioned previously. This appeal then ensued.

III. ANALYSIS

A. THE USE OF A SUPPORT ANIMAL

During defendant's trial a black Labrador retriever named Mr. Weeber was permitted, without objection, to accompany the six-year-old victim and the victim's 10-year-old brother to the witness stand while they testified. Now, on appeal, defendant raises numerous arguments against the use of a support animal. But, as explained below, defendant waived any issues related to the use of the support animal by affirmatively approving of the trial court's action. *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011).

Prior to trial, the prosecution filed a notice of intent to use a support person pursuant to MCL 600.2163a(4), which listed, among other things, Mr. Weeber as a "canine advocate." At a scheduling conference prior to trial, defense counsel indicated that he had no objection to the notice, stating, "I think I have to file an objection and I didn't. We did the research on these three notices and . . . No objection." Because defendant affirmatively stated that he had no objection to the use of a support animal, defendant cannot now complain about the use of the support animal while the victim and the victim's brother testified. *Id*. at 504. Defendant's waiver eliminated any error and appellate review is precluded. *Id*.

Although these issues were waived by defense counsel's affirmative conduct, defendant alternatively argues that he was denied the effective assistance of counsel by his trial counsel's

failure to object to the notice of use of a support person that listed Mr. Weeber as a canine advocate. Appellate review of an unpreserved argument of ineffective assistance of counsel, like this one, is limited to mistakes apparent on the record. *People v Rodgers*, 248 Mich App 702, 713-714; 645 NW2d 294 (2001). Whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law, *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012), and a trial court's findings of fact are reviewed for clear error, while questions of constitutional law are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

The United States and Michigan Constitutions guarantee a defendant the right to effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20; *Trakhtenberg*, 493 Mich at 51. To establish ineffective assistance of counsel, the defendant must show that "(1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced the defendant." *People v Heft*, 299 Mich App 69, 80-81; 829 NW2d 266 (2012). A defendant is prejudiced if, but for defense counsel's errors, the result of the proceeding would have been different. *Id.* at 81. Effective assistance of counsel is presumed, and a defendant bears a heavy burden of proving otherwise. *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012). A defendant must also overcome a strong presumption that his counsel's decisions were the result of sound trial strategy. *People v Sabin*, 242 Mich App 656, 659; 620 NW2d 19 (2000). A defendant is not denied the effective assistance of counsel by counsel's failure to make a futile or meritless objection. *People v Unger*, 278 Mich App 210, 257; 749 NW2d 272 (2008).

## 1. STATUTORY AUTHORITY

Defendant first contends that trial counsel was ineffective for failing to object to the use of a support animal because MCL 600.2163a(4) only allows a support *person* to accompany a witness, not a support animal. "The primary goal of statutory construction is to give effect to the intent of the Legislature." *People v McLaughlin*, 258 Mich App 635, 672; 672 NW2d 860 (2003). To do so, we must begin by examining the language of the statute, and if the statute's language is clear and unambiguous, we must enforce the statute as written. *People v Phillips*, 469 Mich 390, 395; 666 NW2d 657 (2003). When statutory "terms are not expressly defined anywhere in the statute, they must be interpreted on the basis of their ordinary meaning and context in which they are used." *People v Lewis*, 302 Mich App 338, 342; 839 NW2d 37 (2013).

The statute at issue, MCL 600.2163a(4), provides:

> A witness who is called upon to testify shall be permitted to have a support person sit with, accompany, or be in close proximity to the witness during his or her testimony. A notice of intent to use a support person shall name the support person, identify the relationship the support person has with the witness, and give notice to all parties to the proceeding that the witness may request that the named support person sit with the witness when the witness is called upon to testify during any stage of the proceeding. The notice of intent to use a named support person shall be filed with the court and shall be served upon all parties to the proceeding. The court shall rule on a motion objecting to the use of a named support person before the date at which the witness desires to use the support person.

-3-

Because the term "person" is not defined in the statute, it must be interpreted on the basis of its ordinary meaning while keeping in mind the context in which it is used. *Lewis*, 302 Mich App at 342. To ascertain the ordinary and generally accepted meaning of an undefined term, we may consult dictionary definitions. *Id.* The term "person" is defined by *Merriam-Webster's Collegiate Dictionary* (11th ed) as "one (as a human being, a partnership, or a corporation) that is recognized by law as the subject of rights and duties." Based on this definition—and a good deal of common sense—it is clear that a dog is not a "person" within the meaning of MCL 600.2163a(4). Dogs do not have rights and duties as do humans, and in fact are considered personal property. *Koester v VCA Animal Hosp*, 244 Mich App 173, 176; 624 NW2d 209 (2000). Therefore, MCL 600.2163a did not provide the trial court with the authority to allow Mr. Weeber to accompany the victim and the victim's brother while they testified.

Although MCL 600.2163a did not provide the trial court with that specific authority, we hold that the trial court had the inherent authority to utilize this courtroom procedure. As one panel of this Court has previously held, the existence of MCL 600.2163a does not preclude trial courts from using alternative procedures to protect and assist witnesses while testifying, as the Legislature provided that the protections set forth in MCL 600.2163a are "in addition to other protections or procedures afforded to a witness by law or court rule." MCL 600.2163a(20); *People v Rose*, 289 Mich App 499, 509; 808 NW2d 301 (2010). While a trial court may rely on MCL 600.2163a to afford witnesses certain protections, it is well-established that trial courts "have long had the inherent authority to control their courtrooms, which includes the authority to control the mode and order by which witnesses are interrogated." *Id.*, citing MCL 768.29 and MRE 611(a).

The authority and discretion afforded to trial court's to control the course of trial is, in fact, very broad. *People v Banks*, 249 Mich App 247, 256; 642 NW2d 351 (2002). For example, included in this authority, among others, is the ability for a trial court to shackle a defendant during trial, *People v Dunn*, 446 Mich 409, 425-427; 521 NW2d 255 (1994), to shackle a witness while he testifies, *Banks*, 249 Mich App at 257, to impose time limitations on the examination of witnesses, *People v Thompson*, 193 Mich App 58, 62; 483 NW2d 428 (1992), implied overruling on other grounds by *People v Dennany*, 445 Mich 412; 519 NW2d 128 (1994), to bind and gag an "unruly, disruptive, rude and obstreperous" defendant when repeated warnings to a defendant are ineffective, *People v Kerridge*, 20 Mich App 184, 186-188; 173 NW2d 789 (1969), to remove an uncooperative defendant from the courtroom until he agrees to conduct himself properly, *Illinois v Allen*, 397 US 337, 343-344; 90 S Ct 1057; 25 L Ed 2d 353 (1970), and to allow jurors to ask questions to the witnesses, *People v Heard*, 388 Mich 182, 187; 200 NW2d 73 (1972).

In addition to the above examples, this inherent authority also includes the ability to employ procedures that assist a witness when testifying, such as the use of a witness screen to prevent the witness from seeing the defendant, *Rose*, 289 Mich App at 509, the use of "anatomically correct" dolls to help a witness demonstrate a sexual offense,[1] *People v Garvie*,

---

[1] MCL 600.2163a(3) now provides a trial court with the specific authority to utilize this procedure.

148 Mich App 444, 451-452; 384 NW2d 796 (1986), and the use of two-way interactive videoconferencing, *People v Burton*, 219 Mich App 278, 287; 556 NW2d 201 (1996). Much like the use of a screen to make a witness more comfortable when testifying—but much less offensive to the Sixth Amendment Confrontation Clause—the use of a support animal allows the trial court to ease the situation for a young traumatized or fearful witness, while at the same time allowing the jury and the defendant to view the witness while testifying. We therefore hold that it is within the trial court's inherent authority to control its courtroom and the proceedings before it to allow a witness to testify accompanied by a support animal. MCL 768.29; MRE 611(a).[2] Thus, any objection to the trial court's *authority* to allow the victim and victim's brother to be accompanied by the support animal while they testified would have been meritless. Accordingly, counsel's performance did not fall below an objective standard of reasonableness for failing to object on this basis. *Unger*, 278 Mich App at 257.

## 2. DUE PROCESS

While "we recognize that a trial court is entitled to control the proceedings in its courtroom, it is not entitled to do so at the expense of a defendant's constitutional rights." *People v Arquette*, 202 Mich App 227, 232; 507 NW2d 824 (1993). Thus, we next address defendant's contention that trial counsel should have objected to the notice of a support person on the basis that allowing the young witnesses to testify accompanied by the support animal violated his constitutional right to due process.

"Every defendant has a due process right to a fair trial, which includes the right to be presumed innocent." *Rose*, 289 Mich App at 517. In certain circumstances, courtroom procedures or arrangements undermine this presumption of innocence because the procedure or arrangement is deemed inherently prejudicial. *Id*. With regard to challenges of an inherently prejudicial courtroom procedure, the United States Supreme Court has explained that

> [w]henever a courtroom arrangement is challenged as inherently prejudicial . . . the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether "an unacceptable risk is presented of

---

[2] Other jurisdictions have likewise expressly held that a trial court's decision to allow a support animal to accompany a witness while testifying was within the trial court's authority to control courtroom proceedings. *People v Tohom*, 109 AD3d 253, 267; 969 NYS2d 123 (2013) (Court's inherent authority allowed it to permit the use of a support animal); *People v Spence*, 212 Cal App 4th 478, 517; 161 Cal Rptr 478 (2012) (General rule of evidence giving trial court power to set reasonable controls upon the mode of interrogation of child witnesses allowed the use of support animal); *People v Chenault*, 227 Cal App 4th 1503; 175 Cal Rptr 3d 1 (2014); *State v Devon D*, 150 Conn App 514, 543; 90 A3d 383 (2014) (Court has inherent authority to utilize support animal to assist testifying victims); *State v Jacobs*, 2015 Ohio 4353; __ NE3d __ (Ohio App 2015) (Rule of evidence gave trial court authority to utilize support animal for child victim's testimony); *State v Dye*, 178 Wash 2d 541, 553; 309 P3d 1192 (2013) (Court had power to control trial proceedings, including the use of support animal).

impermissible factors coming into play." [*Holbrook v Flynn*, 475 US 560, 570; 106 S Ct 1340; 89 L Ed 2d 525 (1986).]

"[I]f the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Id.* at 572. However, an inherently prejudicial procedure will not be upheld if the procedure was not necessary to further an essential state interest. *Id.* at 568–569.

When determining whether a practice is inherently prejudicial, a court will focus on whether "the practice gives rise primarily to prejudicial inferences or whether it is possible for the jury to make a wider range of inferences from the use of the procedure." *Rose*, 289 Mich App at 518. Similar to a victim's use of a protective screen when testifying, a reasonable jury could conclude that the support animal is being used to calm the witness's general anxiety about testifying, or simply being in an unfamiliar setting. *Id.* at 520 Thus, the practice does not give rise to *primarily* prejudicial inferences, as it is possible for the jury to make a wide range of inferences from the use of this procedure that are unrelated to defendant. *Id.* In addition, the use of a support animal is unlike the inherently prejudicial practices of clothing a defendant in his prison outfit or the shackling of a defendant, as the use of a support animal does not "brand[] a defendant with the mark of guilt." *Id.* Instead, the support animal is merely present to assist the witness, and the presence of the animal does not reflect upon the guilt or innocence of a defendant. Therefore, the use of a support animal does not create "an unacceptable risk . . . of impermissible factors coming into play." *Holbrook*, 475 US at 570.

Fortunately, our nation is a union of independent states, and so we can, when appropriate, turn to decisions of our sister states for guidance. At least two other courts have similarly held that allowing a support animal to accompany a witness while testifying is *less* prejudicial than allowing a support person—which is statutorily permitted in this state—to accompany the witness. *People v Tohom*, 109 AD3d 253, 272-273; 969 NYS2d 123 (2013); *People v Chenault*, 227 Cal App 4th 1503, 1515; 175 Cal Rptr 3d 1 (2014). Specifically, the *Tahom* court stated:

> In fact, permitting a comfort dog to accompany a child victim to the stand during testimony can be considered less prejudicial than allowing "support persons." As explained in Using Dogs for Emotional Support of Testifying Victims of Crime, an article by Marianne Dellinger for the Animal Law Review of Lewis and Clark Law School:
>
> > While dogs may signal the innocence of a witness, any signal from a dog will be much weaker than that emitted from an adult attendant. An adult, especially one who can understand the entirety of the case, including its legal underpinnings, may be seen by a jury to add credibility to the arguments of the plaintiff's witness. In contrast, a dog is 'neutral' and does not understand any of the legal and factual arguments. *It serves the limited function of physically and emotionally standing by the testifying witness*[.]"
> > [*Tohom*, 109 AD3d at 272-273.]

These decisions are consistent with our conclusion that the use of a support animal is more neutral, and thus less prejudicial, than the use of a support person—a procedure deemed

permissible by our Legislature. Their use in appropriate circumstances is therefore not inherently prejudicial.

Since the challenged practice is not inherently prejudicial, defendant is required to show that he was actually prejudiced by the practice. *Holbrook*, 475 US at 571. This he cannot do. The record indicates that Mr. Weeber was brought in by the victim and sat at her feet while she testified and the same procedure occurred when the victim's brother testified. There is no indication that Mr. Weeber was visible to the jury while the witnesses testified, or that he barked, growled, or otherwise interrupted the proceedings or made his presence known to the jury. Therefore, any objection on the basis that this practice violated defendant's right to due process would have been meritless. Defendant is not entitled to a new trial on this basis.

3. PROCEDURAL PROTECTIONS

Defendant, relying on *Chenault*, 227 Cal App 4th 1503, next argues that his counsel was ineffective for failing to request various procedural protections if the support animal was used. Specifically, defendant contends counsel was ineffective (1) when counsel allowed the use of the support animal despite the fact the trial court made no case-specific finding of "good cause," and (2) for failing to request a limiting instruction. We address each of these arguments in turn.

a. FINDINGS

As mentioned above, defendant cites *Chenault*—a case involving the use of a support dog—in support of his argument that there are necessary findings a trial court must make before allowing a witness to utilize a special procedure when testifying. However, before discussing *Chenault*, we find it necessary to review the leading Supreme Court precedents on what case-specific findings, if any, are required when a special procedure is used to assist a witness when he testifies.

The first instructive case is *Coy v Iowa*, 487 US 1012; 108 S Ct 2798; 101 L Ed 2d 857 (1988). In *Coy*, the defendant was arrested and charged with sexually abusing two underage girls while they were camping in their backyard. *Id*. at 1014. The prosecution requested that the complaining witnesses be allowed to testify from behind a screen, which would allow the defendant to see the witnesses, but would prevent the witnesses from seeing the defendant. *Id*. at 1014-1015. In assessing whether the procedure violated the defendant's right to confrontation, the Court stated that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Id*. at 1016. Justice Scalia, writing for the Court, determined that a face-to-face confrontation is guaranteed because it "is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' " *Id*. at 1019.

When turning to the facts in *Coy*, the Court held that it was "difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter." *Id*. at 1020. Nevertheless, the Court did not expressly rule out the use of special procedures when the procedure infringed upon a defendant's right to confrontation. In fact, the Court held that there may be exceptions to the Confrontation Clause, but those exceptions would only "be allowed when necessary to further an important public policy." *Id*. at 1021. The Court rejected the prosecution's argument that such a necessity was established by a legislatively imposed presumption of trauma when it stated that "something more than the type of generalized finding

underlying such a statute is needed when the exception is not 'firmly . . . rooted in our jurisprudence.' " *Id*. (citation omitted). Because there had "been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception" and the Court remanded the case for a harmless-error review. *Id*. at 1021-1022.

Approximately two years later, the Court issued *Maryland v Craig*, 497 US 836; 110 S Ct 3157; 111 L Ed 2d 666 (1990). In *Craig*, the defendant was charged with physically and sexually abusing a six-year-old who attended the defendant's kindergarten center. *Id*. at 840. The prosecution requested that the child be allowed to testify by means of one-way closed-circuit television. *Id*. The trial court permitted the use of the procedure after it received evidence and made a finding, pursuant to the relevant statute, that the child witness would suffer serious emotional distress to the extent that the child would not be able to reasonably communicate. *Id*. at 842-843.

The United States Supreme Court held that the procedure did not violate defendant's right to confrontation. The Court noted that the Confrontation Clause does not require "an actual face-to-face encounter in *every* instance in which testimony is admitted against a defendant" and that Supreme Court precedent established only "a *preference* for face-to-face confrontation." *Id*. at 848-849. This preference, according to the Court, "must occasionally give way to considerations of public policy and the necessities of the case." *Id*. at 849. Although the right to a face-to-face confrontation is not absolute, the Court noted that it cannot be easily dispensed, making clear that a special procedure may only be used if the prosecution shows that it is "necessary to further an important state interest." *Id*. at 850, 852. The Court held that there was a "compelling" state interest "in the protection of minor victims of sex crimes from further trauma and embarrassment." *Id*. at 852 (citation and quotation marks omitted). Because the prosecution was able to demonstrate that there was an important state interest, it was required to make an adequate showing of necessity. *Id*. at 855. With regard to the findings of necessity to justify the use of a special procedure, the Supreme Court stated:

> The requisite finding of necessity must of course be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify. The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma. In other words, if the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present. Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, i.e., more than "mere nervousness or excitement or some reluctance to testify[.]" [*Id*. at 855-856 (citations omitted.).]

Although both *Coy* and *Craig* involved Confrontation Clause issues, and our case does not, they nevertheless provide some insight into that Court's treatment of procedures that assist a witness in testifying in open court.

Having reviewed the pertinent Supreme Court cases, we next turn to the case more heavily relied on by defendant—*Chenault*. In *Chenault*, 227 Cal App 4th 1503, the California Court of Appeals assessed the practice of allowing a young witness to testify accompanied by a support animal. *Id*. at 1516-1517. The defendant in *Chenault*, relying on *Coy and Craig*, argued that the trial court abused its discretion when it allowed a young victim to testify accompanied by a support dog without individualized showings of necessity. *Id*. at 1516. The *Chenault* court concluded that a case-specific finding that an individual needs the presence of a support dog, as outlined in *Coy* and *Craig*, was not required as the Confrontation Clause was not implicated. *Id*. The Court reached this holding because "unlike testimony on a one-way closed circuit television, [the use of a support person or support animal] does not deny a face-to-face confrontation," *id*., which is the principle concern of the Confrontation Clause.

Although the *Chenault* court determined no case-specific finding was required to ensure compliance with constitutional safeguards, the court did conclude that a trial court was required to find that the presence of the support dog would assist or enable the witness to testify without undue harassment or embarrassment and provide complete and truthful testimony, in accordance with a California statute requiring a trial court to "take special care to protect [a witness under the age of 14] from undue harassment or embarrassment." *Id*. at 1514, 1420. The *Chenault* court concluded that the trial court did not abuse its discretion in allowing the young witness to testify accompanied by the support animal because the record revealed the trial court's implicit findings. *Id*. at 1517-1518, 1520-1521.

Initially, we agree with *Chenault* that the required findings pursuant to *Coy* and *Craig* are not required in this instance because the Confrontation Clause is not implicated. As stated in *People v Pesquera*, 244 Mich App 305, 309; 625 NW2d 407 (2001):

> The right to confront one's accusers consists of four separate requirements: (1) a face-to-face meeting of the defendant and the witnesses against him at trial; (2) the witnesses should be competent to testify and their testimony is to be given under oath or affirmation, thereby impressing upon them the seriousness of the matter; (3) the witnesses are subject to cross-examination; and (4) the trier of fact is afforded the opportunity to observe the witnesses' demeanor.

Here, the use of a support dog did not implicate the Confrontation Clause because it did not deny defendant a face-to-face confrontation with his accuser as the victim and the victim's brother testified on the witness stand without obstruction. In addition, the presence of the dog did not affect the witnesses' *competency* to testify, did not affect the oath or affirmation given to the witnesses, the witnesses were still subject to cross-examination, and the trier of fact was still afforded the unfettered opportunity to observe the witnesses' demeanor. Accordingly, defendant's right to confrontation was not implicated by use of the procedure and no specific-finding was required to ensure compliance with the Confrontation Clause. We therefore reject defendant's argument that the trial court was *required* to make findings of good cause or necessity before it allowed the use of the support animal.

While the Confrontation Clause is not implicated in this case, as a practical matter it will be the better practice for trial courts to make some findings regarding its decision to use or not use a support animal. Other jurisdictions that have addressed the use of a support animal are split on whether the trial court is required to make explicit findings of necessity, even when the Confrontation Clause is not implicated. For example, in *State v Dye*, 178 Wash 2d 541, 553; 309 P3d 1192 (2013), the court rejected the assertion that the prosecution was required to demonstrate "substantial need" or "compelling necessity" because the trial court "is in the best position to analyze the actual necessity" of the special procedure and held that a trial court's decision will not be reversed unless the record fails to reveal a party's reasons for needing a support animal, or when the record indicates the trial court failed to consider those reasons. Similar to *Dye*, the court in *Tohom* did not require any explicit findings before allowing the use of a support animal because the statute authorizing the trial court to allow the special procedure did not "set forth any 'necessity' criterion" for a court to consider when exercising its discretion. *Tohom*, 109 AD3d at 266. Likewise, the *Jacobs* court did not require a trial court to make explicit findings; it only required courts to consider the facts and circumstances of the case. *State v Jacobs*, 2015 Ohio 4353; __ NE3d __ (Ohio App 2015); slip op at 6. In contrast to those cases, the Connecticut Appellate Court determined that the trial court, when exercising its inherent authority to control its courtroom, was required to make an explicit finding that "*there was a need for* [the use of the support animal] to be implemented." *State v Devon D*, 150 Conn App 514, 550; 90 A3d 383 (2014).

Lastly, the *Chenault* court held that a trial court was required to find that the use of a support animal would assist or enable the witness to testify without undue harassment or embarrassment, in compliance with the California statute governing a trial court's ability to "take special care" of child witnesses. *Chenault*, 227 Cal App 4th at 1514, 1517. Although the court recognized that express findings on the record were the preferred practice, the court determined that it would not reverse a trial court's decision to utilize the procedure if sufficient evidence was on the record, as implicit findings were adequate. *Id*. at 1520.

In our state, the Legislature has addressed the issue of a trial court's authority to control trial proceedings. MCL 768.29 provides, in part:

> It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.

This statute makes clear that "it is the duty of the judge to control all proceedings during the trial . . . with a view to the expeditious and effective ascertainment of the truth." But it is also clear that there is no requirement for a trial court to make any particular findings when exercising that power. Thus, when the use of a support animal is requested, a trial court should allow its use when it is useful to the expeditious and effective ascertainment of the truth. In employing its discretion, the court should consider the facts and circumstances of each individual witness to determine whether the use of the support animal will be useful to the expeditious and effective ascertainment of the truth.

Turning to defendant's ineffective assistance of counsel argument, defendant is not entitled to relief as any objection on the grounds that the trial court failed to make a finding of

-10-

"good cause" would have been meritless. As discussed above, a trial court's decision to allow the procedure will be reversed only when the procedure was not useful to the expeditious and effective ascertainment of the truth. The six-year-old victim was the victim of first and second-degree criminal sexual conduct, which was allegedly[3] perpetrated by the victim's family member, her uncle. Additionally, the victim and the victim's brother expressed a desire to use the special procedure as they elected to be accompanied by Mr. Weeber, instead of their mother or father, who were listed as support persons on the prosecution's notice of intent. Furthermore, the notice of intent indicated that the support animal was to be used to protect and support the witnesses while they testified. Given the witnesses' young age, it is likely that the trial court would have found that the use of the support dog was useful to the expeditious and effective ascertainment of the truth and any objection to the contrary would have been meritless.[4]

Defendant also cannot overcome the presumption that counsel's failure to object was sound trial strategy. At trial, the defense's theory was that the victim was "coached" to say that defendant committed these sexual acts. In fact, during closing argument, defense counsel argued that the victim was able to "spit back, so to speak, her script," and that she kept "saying the same thing that we think was fed to her by these other people, her parents or whatever." Thus, it very well could have been trial counsel's strategy to allow the support animal to accompany the victim while testifying so that she would appear calm while testifying, which would make it appear that she was coached on what to say at trial. Consequently, defendant has not overcome the strong presumption that counsel's performance was sound trial strategy.

### b. LIMITING INSTRUCTION

Defendant next contends that a limiting instruction should have been provided to the jury when the support animal was utilized. Defendant's attorney failed to request one, and according to defendant, this rendered his counsel ineffective. He is wrong.

There are no Michigan jury instructions addressing the use of a support animal. Nor are there any cases addressing what otherwise may be an appropriate jury instruction when using support animals. And, as already pointed out, the statute allowing use of support persons contains no requirement for any particular findings or instructions to be given to the jury. Consequently, we are hard pressed to conclude that counsel was ineffective in failing to ask for an instruction that does not yet exist in Michigan. This is particularly so when, as explained

---

[3] Allegedly at the time of trial. On appeal from a conviction, the defendant is no longer presumed innocent. *People v Peters*, 449 Mich 515, 519; 537 NW2d 160 (1995).

[4] When a witness will be testifying accompanied by a support animal, it may be wise for the witness and support animal to get situated on the witness stand outside the presence of the jury. *Chenualt*, 227 Cal App at 1519. Once situated and the jury returns to the courtroom, the trial court should inform the jury that the witness will be accompanied by a support animal while testifying. *Id*.

below, the trial court provided a sufficient instruction to ensure that the jury did not rely on the support animal's presence in reaching its verdict.[5]

Indeed, even assuming counsel's performance was deficient for failing to request a specific instruction regarding the use of the support dog, defendant was not prejudiced because the jury instruction provided by the trial court informed the jury to decide the case based solely on the evidence and to not render a decision based on sympathy or bias.[6] Because we presume jurors follow their instructions, *People v Mahone*, 294 Mich App 208, 218; 816 NW2d 436 (2011), the jury should have disregarded the presence of the dog while deliberating since the dog was not part of the evidence. Accordingly, defendant has not shown but for defense counsel's error, the result of the proceeding would have been different. *Heft*, 299 Mich App at 81.

### B. ADMISSIBILITY OF HEARSAY STATEMENTS

Defendant next argues that the trial court abused its discretion when it admitted inadmissible hearsay. However, this issue has also been waived, precluding appellate review. *Kowalski*, 489 Mich at 503. Prior to trial, the prosecution filed a notice of intent to use statements the victim made to Mann during a physical examination, arguing that the statements were admissible under MRE 803(4). At a scheduling conference prior to trial, defense counsel

---

[5] We do note that the *Chenualt* court provided a good example of an instruction for use in these situations. Depending, of course, on the circumstances confronting the trial court, a court may consider instructing the jury that it (1) "should disregard the dog's presence and decide the case based solely on the evidence presented, [(2)] should not consider the witness's testimony to be any more or less credible because of the dog's presence, and [(3)] should not be biased either for or against the witness, the prosecution, or the defendant based on the dog's presence." *Chenualt*, 227 Cal App 4th at 1518.

[6] In this case, the trial court informed that jury that the witness would be accompanied by a "therapy dog from the prosecutor's office." Defendant takes issue with the trial court's use of the term "therapy dog." Though we are not overly concerned with the nomenclature used for these support dogs, we note that at least one court has stated that "[t]he preferred term for a dog used in a courthouse setting to provide comfort to a witness is facility dog," but also recognized that the cases and literature utilize other appropriate terms, such as "testimony dogs, courthouse dogs, companion dogs, therapy dogs, service dogs, comfort dogs, therapy assistance dogs, support canines, and therapeutic comfort dogs," because "these terms imply canine functions in providing comfort and reducing anxiety." *Devon D*, 90 A3d at 399 n 10 (citation and quotation marks omitted). However, we agree with defendant that the term "therapy dog" is not the most appropriate, particularly because the term could imply that the witness was undergoing therapy as a result of the sexual assault. Nonetheless, the trial court also indicated that the dog was from the prosecutor's office, thus signaling to the jury that the dog was not the witness' own therapy dog, but rather one provided by the prosecution to assist the witness with providing testimony. Therefore, no error occurred and any objection to the trial court's use of the term therapy dog would have been meritless.

indicated that he had researched the issue and had no objection to the notice. Given that defendant clearly indicated that he had no objection to the hearsay statements, defendant waived this issue and the waiver eliminated any error. *Id*.

Alternatively, defendant argues that his trial counsel should have filed an objection to exclude the victim's hearsay statements made to Mann because they were not trustworthy, and was ineffective in not doing so. " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is generally not admissible unless an exception to the rule applies. MRE 802. One exception to the hearsay rule is contained in MRE 803(4) which permits admission of "[s]tatements made for purposes of medical treatment or medical diagnosis in connection with treatment . . . ." MRE 803(4). "Particularly in cases of sexual assault, in which the injuries might be latent . . . a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment." *Mahone*, 294 Mich App at 215.

In *People v Meeboer (After Remand)*, 439 Mich 310, 315; 484 NW2d 621 (1992), the Court examined the application of MRE 803(4) to hearsay statements made to medical providers by child victims of sexual abuse. The *Meeboer* Court held that an inquiry into the trustworthiness of a child's statements made to a health care provider should "consider the totality of circumstances surrounding the declaration of the out-of-court statement," and identified the following factors in determining the trustworthiness of a child's statement:

> (1) the age and maturity of the declarant, (2) the manner in which the statements are elicited (leading questions may undermine the trustworthiness of a statement), (3) the manner in which the statements are phrased (childlike terminology may be evidence of genuineness), (4) use of terminology unexpected of a child of similar age, (5) who initiated the examination (prosecutorial initiation may indicate that the examination was not intended for purposes of medical diagnosis and treatment), (6) the timing of the examination in relation to the assault (the child is still suffering pain and distress), (7) the timing of the examination in relation to the trial (involving the purpose of the examination), (8) the type of examination (statements made in the course of treatment for psychological disorders may not be as reliable), (9) the relation of the declarant to the person identified (evidence that the child did not mistake the identity), and (10) the existence of or lack of motive to fabricate. [*Id*. at 324–325 (footnotes with citations omitted).]

In the present case, the victim was six-years old and defendant admitted that she was "smart," indicating the maturity of the declarant. The record indicates that Mann used open ended questions when eliciting the statements from the victim and that the purpose of the examination was to make sure the victim was "healthy" and to make sure she was safe in her home. Additionally, Mann opined that the victim phrased her statements in a childlike manner because she emphasized the fact that defendant did not wash his penis before putting it in her mouth, which would be in contrast to an adult that would likely emphasize the actual act of penetration.

The evidence also suggests that the victim may have still been under distress of the sexual acts as she initially did not want to discuss the acts with Mann. The examination was held

on August 5, 2014, less than one month after the victim's disclosure, and more than four months prior to trial, tending to show that the purpose of the exam was not for litigation purposes. There was also no evidence that the victim made a mistake in identification because the person identified as the perpetrator was her uncle, someone with whom she was familiar. These factors all weigh in favor of finding that the victim's statements to Mann were trustworthy. In contrast, only two factors weigh against a finding that the victim's statements were trustworthy. First, the record indicates that CPS initiated the examination, which could demonstrate that the medical examination was not intended for medical treatment or diagnosis. Second, testimony was presented that the victim did not like it when defendant babysat because he would make them clean and do chores, thus suggesting a motive to fabricate. After a review of the relevant factors, the totality of the circumstances support the admission of the victim's statements as they were trustworthy, indicating that any objection to the admission of the hearsay statements would have been meritless. Consequently, defendant's trial counsel was not constitutionally ineffective. *Unger*, 278 Mich App at 257.

### C. JUDICIAL BIAS

We also disagree with defendant that his trial counsel was ineffective for failing to file a motion to disqualify the trial judge because she was biased. "A criminal defendant is entitled to a 'neutral and detached magistrate.' " *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011), quoting *People v Cheeks*, 216 Mich App 470, 480; 549 NW2d 584 (1996). A defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality. *Jackson*, 292 Mich App at 598 (citation and quotation marks omitted). "Judicial rulings, as well as a judge's opinions formed during the trial process, are not themselves valid grounds for alleging bias 'unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible.' " *Id.*, quoting *People v Wells*, 238 Mich App 383, 391; 605 NW2d 374 (1999).

Here, defendant argues that the trial judge was biased because she found the victim credible at the preliminary examination. However, "[m]erely proving that a judge conducted a prior proceeding against the same defendant does not amount to proof of bias for purposes of disqualification." *People v White*, 411 Mich 366, 386; 308 NW2d 128 (1981). Further, the trial judge's opinion of the victim's credibility was formed during the trial process (the preliminary examination), which is an insufficient ground for proving bias unless the defendant can show that there was deep-seated favoritism or antagonism such that the exercise of fair judgment was impossible. *Jackson*, 292 Mich App at 598. Defendant points to the fact that the trial judge subsequently allowed the victim to testify with a support animal at trial to demonstrate that the trial court was not able to exercise fair judgment, but nothing reflects that this ruling was made out of deep-seated favoritism or antagonism. Instead, the ruling was made primarily because of the young victim's age. Thus, defendant cannot overcome the heavy presumption of judicial impartiality, which means any motion to disqualify the trial judge would have been meritless. Accordingly, defendant was not denied the effective assistance of counsel.

### D. COURT COSTS AND FINE

Defendant also takes issue with the trial court's order requiring him to pay $600 in court costs and a $100 fine. Because defendant failed to object when the trial court ordered him to pay court costs and the fine, the issue is unpreserved. *People v Konopka (On Remand)*, 309 Mich

App 345, 356; 869 NW2d 651 (2015). An unpreserved challenge to a trial court's imposition of court costs is reviewed for plain error affecting a defendant's substantial rights. *Id*. In order for a defendant to establish plain error, he must show that (1) an error occurred, (2) the error was plain, clear or obvious, and (3) the plain error affected substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

MCL 769.1k, as interpreted by *People v Cunningham*, 496 Mich 145, 158; 852 NW2d 118 (2014), did not provide trial courts with separate statutory authority to impose court costs at sentencing. In response to the *Cunningham* decision, the legislature enacted 2014 PA 352, which was a curative measure to address the authority of courts to impose costs under MCL 769.1k. *Konopka*, 309 Mich App at 354-355, 357. The amended version of MCL 769.1k applies to court costs ordered before June 18, 2014, and after October 17, 2014, the effective date of the amendatory act. *Id*. at 355, 357. MCL 769.1k now provides:

(b) The court may impose any or all of the following:

(i) Any fine authorized by the statute for a violation of which the defendant entered a plea of guilty or nolo contendere or the court determined that the defendant was guilty.

(ii) Any cost authorized by the statute for a violation of which the defendant entered a plea of guilty or nolo contendere or the court determined that the defendant was guilty.

(iii) Until 36 months after the date the amendatory act that added subsection (7) is enacted into law, any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case, including, but not limited to, the following:

(A) Salaries and benefits for relevant court personnel.

(B) Goods and services necessary for the operation of the court.

(C) Necessary expenses for the operation and maintenance of court buildings and facilities.

Although defendant contends that giving retroactive effect to 2014 PA 352 would violate the state and federal Ex Post Facto Clauses, this Court in *Konopka* held that 2014 PA 352 does not violate the state and federal Ex Post Facto Clauses as the "court costs imposed under MCL 769.1k(1)(b)(iii) are not a form of punishment" because the court costs are intended to be a civil remedy *Id*. at 370, 373. To the extent defendant argues that *Konopka* was wrongly decided, this Court is bound by that decision. MCR 7.215(J)(1).

Defendant also argues that the trial court erred when it imposed upon him a $100 fine. As mentioned above, MCL 769.1k allows the trial court to impose "any fine authorized by the statute for a violation of which the defendant entered a plea of guilty or nolo contendere or the court determined that the defendant was guilty." MCL 769.1k(1)(b)(i). Here, defendant was found guilty of first-degree criminal sexual conduct, MCL 750.520b(1)(a), and second-degree

criminal sexual conduct, MCL 750.520c(1)(a), neither of which allow for the imposition of a fine. Therefore, as the prosecution concedes, the trial court erred when it ordered defendant to pay a $100 fine.

## E. RESTITUTION

We agree—as does the prosecution—that the trial court erred when it ordered defendant to pay $900 in restitution for damages caused by a course of conduct that did not give rise to a conviction. See *People v McKinley*, 496 Mich 410, 419-20; 852 NW2d 770 (2014). The trial court shall reduce the restitution order by $900.

## F. PROSECUTORIAL ERROR

In defendant's Standard 4 brief, he argues several unpreserved instances of prosecutorial error, including the prosecutor's use of leading questions and certain errors during the prosecutor's opening statement and closing argument. However, defendant has abandoned these issues by providing no case law or legal analysis to support his assertion that the prosecutor engaged in prosecutorial error. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Payne*, 285 Mich App 181, 195; 774 NW2d 714 (2009). Even assuming that the issue was not abandoned, defendant is not entitled to relief.

MRE 611(d)(1) provides that "[l]eading question should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." However, a prosecutor has considerable leeway to ask leading questions to child witnesses. *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001). In order to demonstrate that reversal is warranted for the prosecution asking leading questions, it is necessary "to show some prejudice or pattern of eliciting inadmissible testimony." *Id*. at 588.

In this case, the prosecutor's use of leading questions was necessary to develop the victim's testimony. The victim was three-years old at the time the sexual acts occurred and was only six-years old at the time she testified. It is clear from her testimony that she was distraught and needed guidance to develop her testimony. Many times the victim asked for clarification or did not understand the questions that were asked by the prosecutor. Given that leading questions were necessary to develop the victim's testimony, no plain error occurred. Moreover, reversal is not required as defendant has not shown any prejudice or pattern of eliciting inadmissible testimony by the prosecutor's use of leading questions.[7]

---

[7] In addition, defendant complains of leading questions at his preliminary examination. However, a preliminary examination is not a constitutional based procedure and any errors that occur at a preliminary examination will be deemed harmless if the defendant is subsequently convicted at an otherwise fair trial. *People v Hall*, 435 Mich 599, 602-603, 611-613; 460 NW2d 520 (1990). Defendant has not shown that he was denied a fair trial, and is not entitled to relief.

Lastly, defendant raises numerous instances of alleged prosecutorial error during opening statements and closing arguments. To determine whether prosecutorial error has occurred, this Court looks to whether the defendant received a fair and impartial trial. *Watson*, 245 Mich App at 586. The appropriate time for a prosecutor to state what evidence will be submitted and what he intends to prove at trial is during opening statements. *People v Meissner*, 294 Mich App 438, 456; 812 NW2d 37 (2011). When a prosecutor states that evidence will be submitted, and the evidence is not presented, reversal is not warranted if the prosecutor did so acting in good faith. *People v Johnson*, 187 Mich App 621, 626; 468 NW2d 307 (1991). With regard to closing arguments, a prosecutor may not make a factual statement to the jury that is not supported by the evidence, but a prosecutor is free to argue the evidence and all reasonable inferences arising from it as it relates to the theory of the case. *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). Furthermore, a prosecutor may not inject into trial his personal beliefs or opinions of a defendant's guilt. *People v Erickson*, 288 Mich App 192, 200; 793 NW2d 120 (2010).

After a review of the record, we conclude that most of the alleged instances of prosecutorial error were arguments that were supported by facts (or the reasonable inferences from these facts) in evidence. To the extent any prosecutorial error did occur during opening statements and closing arguments, defendant is unable to establish that he was prejudiced. The trial court subsequently instructed the jury to base the verdict solely on the evidence that was presented and that the attorney's arguments were not evidence. This instruction cured any prosecutorial error that may have occurred during opening statements and closing argument. *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Relief is not warranted.

We affirm defendant's convictions and sentences, but remand for the trial court to modify the judgment of sentence consistent with this opinion. We do not retain jurisdiction

/s/ Christopher M. Murray
/s/ Peter D. O'Connell
/s/ Jane E. Markey